Eric M. George (SBN 166403)
egeorge@ellisgeorge.com
Noah S. Helpern (SBN 254023)
nhelpern@ellisgeorge.com
Todd M. Lander (SBN 173031)
tlander@ellisgeorge.com
ELLIS GEORGE LLP
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Ethan J. Brown (SBN 218814)
ethan@bnsklaw.com
Sara C. Colón (SBN 281514)
sara@bnsklaw.com
BROWN NERI SMITH & KHAN, LLP
11601 Wilshire Blvd., Ste. 2080
Los Angeles, CA 90025
T: (310) 593-9890
F: (310) 593-9980

*Attorneys for Plaintiffs*
Caruso Management Company, Ltd. and
The Commons at Calabasas, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARUSO MANAGEMENT COMPANY, LTD., a California limited partnership; THE COMMONS AT CALABASAS, LLC, a California Limited Liability Company,<br><br>Plaintiffs,<br><br>v.<br><br>LEXINGTON INSURANCE COMPANY, a Delaware corporation,<br><br>Defendant. | Case No.   2:24-CV-9449<br><br>**COMPLAINT FOR:**<br>   1. **Breach of Contract**<br>   2. **Breach of Implied Covenant of Good Faith and Fair Dealing**<br>   3. **Declaratory Relief**<br><br>**DEMAND FOR JURY TRIAL** |

2478973

COMPLAINT

Plaintiffs Caruso Management Company, Ltd. and The Commons at Calabasas, LLC, by and through their attorneys of record, complain and allege as follows:

**INTRODUCTION**

1. This action concerns Lexington Insurance Company's ("Lexington") bad faith breach of an insurance contract relating to a retail shopping center developed by Plaintiffs known as The Commons at Calabasas (the "Center"). The Center is owned by The Commons at Calabasas, LLC ("The Commons LLC") and managed by Caruso Management Company, Ltd. ("Caruso") (collectively, "Plaintiffs"). Plaintiffs paid Lexington $1 million for an insurance policy protecting the Center and its owners from property damage losses and resultant business interruption. And yet, despite readily collecting that $1 million from Plaintiffs, Lexington has delayed, obstructed, and ultimately (and pretextually) declined to cover property damage at the Center, and did so after its delays and reversals of position had proven significantly prejudicial to Plaintiffs.

2. Plaintiffs made a claim to Lexington for damage to the foundational slabs at the Center in or about December 2014. For many years, and after thoroughly investigating the claim, Lexington made payments on Plaintiffs' claim for property damage and related business interruption at the Center. Only in 2019, after Lexington realized that payments for necessary repairs could extend many more years into the future, did Lexington ask Plaintiffs for an estimate of the total projected costs of repair and associated business interruption losses. And only after receiving this estimate did Lexington change its tune, putting a stop to its incremental payments on the claim and instead initiating a scorched earth, bad faith investigation regarding a claim that was by then many years old and on which it had been making payments for years.

3. Lexington commenced its scheme to shirk its coverage obligations as soon as it received Plaintiffs' full estimate of repair costs. Lexington's bad faith

2478973

COMPLAINT

scheme included: repeatedly taking new and often contradictory positions with respect to the claim; taking no position on the claim and simply delaying payments without explanation; refusing to properly respond to inquiries from and information provided by Plaintiffs; on information and belief, retaining a second engineering firm to re-investigate the claim—imposing a significant burden on Plaintiffs—years after Lexington's prior engineering firm had already investigated the claim (and had apparently reached a conclusion that caused Lexington to incrementally pay on the claim); using the delays caused by its own conduct to draw out the claims process long enough to allow Lexington to formulate pretextual bases for denying Plaintiffs' claim; inducing Plaintiffs to take a particular course of action that, without Lexington's coverage, would prove significantly more costly to Plaintiffs; and making numerous duplicative and burdensome demands for documents.

4. In late 2023, after delaying payments for three years under the guise that it wanted to reach a global resolution of all existing and potential future claims—and inducing Plaintiffs to rely on that expressed desire—Lexington *again* asked for an estimate of the total projected repair cost and associated business interruption losses. Plaintiffs *again* prepared and provided such an estimate. Lexington then *again* delayed for months, neither responding to the estimate nor reimbursing Plaintiffs for repair costs and business interruption that had already been incurred.

5. Lexington made clear to Plaintiffs that it was preparing a response to the latest estimate in an effort to reach a global resolution, which Plaintiffs reasonably believed was the cause of the delay. What the Plaintiffs did not know—because Lexington concealed it—was that Lexington was instead secretly seeking to manufacture a basis, any basis, to deny the claim. Lexington did not respond until July 2024, *nearly ten years after first being notified of the slab damages at the Center* and more than six months after receipt of Plaintiffs' (latest) good faith estimates of future repair costs. That response was a full declination of coverage,

relying on a factually and legally baseless argument that the claim was uninsurable. That is, Lexington purports to contend, *ten years after the claim was made*, that it suddenly discovered a lack of coverage. These facts present a textbook case of bad faith.

6. Lexington's unreasonable and bad faith denial of coverage necessitates the present suit. Plaintiffs seek a declaration that Plaintiffs are entitled to coverage under the policy for all slab damage previously reported and for future damage and losses caused by heaving bedrock and gypsum growth at the Center. Plaintiffs also seek reimbursement for the repair work costs at the Center as well as attorneys' fees and punitive damages resulting from Lexington's wrongful conduct.

## **PARTIES**

7. Plaintiff Caruso Management Company, Ltd. is a California limited partnership doing business at all relevant times in Los Angeles County, California. Caruso Management Company, Ltd. is, for the purposes of diversity jurisdiction, a citizen of the State of California because the ultimate and 100% owners of Caruso Management Company, Ltd. are (1) Caruso Property Management, Inc., a California corporation, and (2) two separate trusts, each of which is organized for the benefit of Rick J. Caruso and his family and each of which is a citizen of the State of California, including because their respective trustees are citizens of the State of California.

8. Caruso manages The Commons at Calabasas, a retail development in Calabasas, California, and procured the insurance that covers the Center and other properties managed by Caruso.

9. Plaintiff The Commons at Calabasas, LLC owns the Center, which is located in Los Angeles County. The Commons at Calabasas, LLC is a California limited liability company and is, for the purposes of diversity jurisdiction, a citizen of the State of California because its ultimate and 100% owners are Century Investments, Inc., a California corporation, and Caruso Property Management, Inc.,

1  a California corporation.

2      10.    Defendant Lexington Insurance Company is, and at all relevant times was, a Delaware corporation with headquarters in Boston, Massachusetts. Lexington is authorized to and does sell insurance in California. Lexington sold Plaintiff commercial property insurance policy number 020412905 (the "Policy") on the Center as well as policies covering both earlier and later years.

## JURISDICTION AND VENUE

    11.    This litigation is a civil action over which this Court has original diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of the parties and the amount in controversy. Both plaintiffs are citizens of the State of California (*supra*, ¶¶ 7-9) and the defendant is a citizen of another state (*supra*, ¶ 10).

    12.    The amount in controversy in this matter exceeds $75,000. Plaintiffs seek a declaration that Lexington will cover losses that are likely to reach into the millions of dollars. Plaintiffs also seek reimbursement for approximately $600,000 in out-of-pocket costs, as well as prejudgment interest, attorneys' fees, and punitive damages that far exceed the jurisdictional amount, as set forth more fully herein.

    13.    The insurance contract between Plaintiffs and Defendant that is the subject of this action was issued in this District. Further, the property on which the loss giving rise to this action occurred is in this District. Therefore, venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### THE COMMONS AT CALABASAS AND THE POLICY

    14.    The Center is an outdoor retail shopping center in Calabasas consisting of over 215,000 square feet of retail space. Construction of the Center included, among other things, excavation of a hillside in the back portion of the property and the construction of a retaining wall. The Center opened in 1998. Plaintiffs have continually owned and operated the Center from inception through today.

15. In 2014, Caruso insured the Center through the Policy with Lexington. The Policy broadly and comprehensively "insures against all risk of physical loss of or damage" to the Center, with a coverage period of July 15, 2014 to July 15, 2015. The Policy also provides coverage for "[l]oss resulting from necessary interruption of business conducted by the Insured, whether total or partial, and caused by loss, damage or destruction covered herein during the term of this policy..." Plaintiffs paid over one million dollars for the Policy, which had coverage limits of $25 million. Plaintiffs subsequently renewed the Policy after the initial coverage period.

PLAINTIFFS DISCOVER THE DAMAGE

16. In late 2014 and early 2015, Plaintiffs discovered that the floor of the unit at the Center that, at that time, was occupied by Rite Aid was experiencing significant cracking and sloping.

17. Upon observation of this significant cracking and sloping, Plaintiffs timely made a claim under the Policy for physical damage to the Rite Aid space.

18. Due to the cracking and sloping in its unit, Rite Aid engaged a company called Geokinetics to conduct a manometer survey at the Center. Geokinetics released its report to Lexington in November 2015. On information and belief, Lexington also retained an engineering firm to investigate the damage at the Center. As other tenancies at the Center ended and Plaintiffs had an opportunity to observe those former tenants' units in detail, similar slab damage was discovered at those other units. Upon each discovery of such damage, Plaintiffs timely notified Lexington pursuant to the Policy. Plaintiffs' claim to Lexington was for both damage to the foundational slabs and for business interruption in the form of lost rental income sustained while the slabs were repaired (because new tenants could not move in until the repairs were complete).

19. In April 2016, The Commons LLC hired Kleinfelder, Inc. ("Kleinfelder"), a large and well-known engineering firm, to conduct a geotechnical investigation of the damage to the Rite-Aid building of the Commons. The

Kleinfelder investigation included an extensive field exploration, laboratory testing, and engineering analysis and resulted in a report shared with Lexington.

20. The resulting May 20, 2016, Kleinfelder report (the "Kleinfelder Report") concluded that the damage to the floor of the Rite Aid was likely due to a combination of unloading of the bedrock following the excavation of 15 to 45 feet of material to establish site grades, and swelling of the bedrock due to increases in moisture content. The referenced excavation related to the hillside that was excavated at the back portion of the Center during construction. On information and belief, these conclusions aligned with the conclusions reached by the engineering firm hired by Lexington to assess the damage.

21. In a December 2016 email, Lexington's representatives acknowledged that there was damage not only to the Rite Aid location at the Center but also to other locations in the Center.

### INCREMENTAL REPAIRS AND PAYMENT BY LEXINGTON

22. By or before January 2017, Plaintiffs disclosed the issue of the slab damage to The City of Calabasas (the "City"), as the City would be responsible for issuing permits for construction to repair the tenant spaces at the Center. In order to mitigate business interruption losses, Caruso advocated, and the City agreed, to allow the slab repairs to wait until the rollover of tenants at the Center. Thus, as tenants vacated their premises following expiration of their lease and permits would be required for tenant improvements, the City mandated that Plaintiffs examine and, if necessary, repair the underlying slab in accordance with City specifications.

23. On April 27, 2017, after additional field work and investigation, Kleinfelder issued an Addendum to its May 2016 report (the "2017 Addendum") indicating that the actual cause of the soil expansion at the Center was a chemical reaction that created gypsum in the soils and bedrock beneath the Center. Specifically, the 2017 Addendum concluded, "It is our opinion that the movement is primarily induced by oxidation of pyrite minerals present in the bedrock to form

gypsum within the dipping bedrock and bedrock fractures." Because the gypsum was likely to continue to grow, this new information meant that additional heaving would continue to cause damage to the slab in a much more substantial way than anyone could have predicted based on the damage observed and what was known previously. Prior to the 2017 Addendum, the mechanism causing the slab damage was not fully understood and therefore the expected extent of the damage was also uncertain.

24. When The Commons LLC submitted its claim under the Policy, Lexington initially took the position that the slab damage resulted from normal wear and tear and settlement, which it contended was expressly excluded from the policy. However, after Plaintiffs provided the Kleinfelder Report and substantial additional information to Lexington, Lexington acknowledged coverage by beginning to reimburse repair costs and business interruption losses as they were incurred. Lexington also acknowledged the incremental repair plan Plaintiffs had developed with the City, which mitigated what could have otherwise been an immediate and enormous business interruption loss ultimately to be borne by Lexington, because the Policy covered such losses. Conversely, however, this incremental repair plan increased overall repair costs, since construction costs have dramatically increased since 2014. In reliance on Lexington's agreement to the incremental repair plan, Plaintiffs proceeded accordingly; from 2016 to 2020, in a series of incremental partial payments, Lexington reimbursed Plaintiffs nearly $2 million for property damage at various tenant spaces, including the Rite Aid space.

25. Throughout 2017, Plaintiffs advised Lexington that tenant spaces other than the Rite Aid, including the space occupied by Barnes & Noble, were damaged by the same process. Plaintiffs also made it clear to Lexington that they could not know the full extent of the damage until other tenants moved out of their spaces, which would allow for inspection of the floor slabs at those other units. Indeed, at all times thereafter, Plaintiffs invited Lexington and its consultants to inspect the

slabs as tenants rolled over so they could participate in the assessment of damage and appropriate repairs, and Plaintiffs' discussions with Lexington about the scope of loss were always in the form of estimates because no one could be certain about which tenant spaces damage would manifest or the severity of such damage.

26. In April 2018, Plaintiffs provided Lexington with information about another location (a Kate Spade store) that had been damaged by the same process.

27. In February 2019, Lexington asked for a meeting to discuss how to finalize Plaintiffs' claims "along with the loss of rents and the claim for Barnes and Noble," making it clear that Lexington understood there was much more to resolve than simply Barnes & Noble. A spreadsheet referencing costs at multiple locations was attached to this correspondence.

28. By mid-July 2019, work was ongoing at the former Kate Spade location and had been completed at seven other retail tenant spaces. Plaintiffs further noted to Lexington a tenant who was vacating in 2019, and that a slab repair might be needed at that location (the former Beauty Collection space).

## LEXINGTON'S BAD FAITH SCHEME TO AVOID COVERAGE

29. Presumably recognizing that slab damage would continue to manifest for years at the Center and that Lexington's serial, incremental payments on the claim would continue over that same duration, in 2019 Lexington asked Plaintiffs for an estimate of the total projected loss. Plaintiffs provided Lexington with such estimate in mid-2020. Once Lexington realized, based on the estimate that it did not request until approximately five years after that initial claim was made, that total projected repair costs and business interruption losses could balloon to tens of millions of dollars over a period of more than ten years, Lexington abruptly changed its approach to what had, from Plaintiffs' perspective and until then, been a collaborative relationship between insurer and insured. Rather than reimbursing losses, as it had for various units over several years, Lexington embarked on a knowing and intentional plan to avoid its coverage obligations at all costs.

30. As the claimed losses mounted, Lexington started to look for excuses to avoid coverage. In September 2019, Lexington wrote to Plaintiffs and disputed, for the first time and without basis, Kleinfelder's 2017 finding that the cause of the heaving was related to gypsum formation and attempted to assert a Policy exclusion based on defective soil installation. Still, Lexington ultimately continued paying the claim after Plaintiffs pointed out the multiple deficiencies in Lexington's position.

31. At the end of 2020, Lexington took the position that not all slab repairs at the Center were caused by the same mechanism that had caused the loss to the Rite Aid unit and thus did not relate back to that initial claim and policy year. Lexington—who continued to insure the Center in subsequent policy years after 2014—presumably took this position because it thought it had more robust exclusions in later policies and because, in later policy years, other carriers shared the risk.

32. Nevertheless, through early 2021, Lexington paid for multiple losses arising from the above-described processes, including slab repairs at units occupied by former Center tenants Menchie's, Verizon, and White House Black Market. Additional spaces were subsequently reviewed and repaired, with costs of repairs reimbursed and business interruption losses paid for by Lexington. Lexington paid for losses associated with unit F6A, which is immediately adjacent to F5 (a subject of this action), in early 2021.

33. In early 2021, Plaintiffs requested that Lexington cover the costs to repair two additional units under the original claim: the spaces designated F5 (formerly Le Pain Quotidien) and H6 (formerly L'Occitane), both of which were vacated in or around 2020. Upon the vacancy of units F5 and H6, Plaintiffs determined that those spaces also suffered from damage caused by the same processes that had caused the damage first observed in 2014. As with other units, Plaintiffs invited Lexington's insurance adjusters to view the damage and participate in the decisions regarding the scope of repairs (which had to be completed in

1  accordance with the City's specifications).  At no time during the slab demolition
2  and repairs at units F5 and H6 did Lexington advise Plaintiffs that the damage
3  would not be covered.

4      34.    In reliance on the fact that Lexington never suggested or contended that
5  the damage to units F5 and H6 was any different than the damage Lexington had
6  paying for under the Policy since 2016, Plaintiffs paid over $600,000 for repairs
7  caused by heaving bedrock and gypsum growth at units F5 and H6.  Plaintiffs duly
8  collected and tracked the various costs for the slab repair and provided calculations
9  of the business interruption losses to Lexington's adjusters.  And, just as they had
10  for other repaired units at the Center, Plaintiffs requested reimbursement from
11  Lexington for these costs and losses.  By approximately March of 2021, Plaintiffs
12  had submitted to Lexington substantially all costs and information related to the
13  repair of spaces F5 and H6.

14      35.    Furthermore, Plaintiffs relied on what, for years, appeared to be good
15  faith conduct by Lexington in covering these claimed losses in making the decision
16  to continue to work with Lexington (and its parent company, AIG) in order to insure
17  the Center and other properties associated with Plaintiffs.  This, of course, proved to
18  be extremely lucrative for Lexington and AIG.  Plaintiff Caruso has a large real
19  estate portfolio throughout Southern California, and AIG benefitted greatly from the
20  premiums paid to it and its subsidiaries by Plaintiffs during the decade in which
21  Lexington purported to cover the Plaintiffs' claim.

22      36.    Unbeknownst to Plaintiffs, however, Lexington was still trying to find
23  a way to stop paying on the slab claim.  Lexington knew—based on the estimate
24  supplied by Plaintiffs at Lexington's request—that damage was likely to continue
25  for many years and result in millions of dollars of additional reimbursements to
26  Plaintiffs.  Lexington had apparently decided it did not want to pay.

27      37.    As part of what Plaintiffs now know was Lexington's plan to avoid its
28  coverage obligations, Lexington embarked on a scorched earth campaign to

pretextually re-investigate the entire history of damage at the Center to find some basis it could argue provided a reason to stop paying on the claim.

38. First, in April 2023, Lexington requested further information from Plaintiffs regarding the damage at the Center even though it had already requested and received substantial documentation and had the full opportunity to investigate and test for years. Second, in July 2023, after the request to reimburse costs incurred for units F5 and H6 was over two years old, rather than pay for the damage, Lexington retained a second engineering firm—Wiss, Janney, Elster Associates, Inc. ("Wiss Janney")—to re-review the Center and the various analyses of the scope of the damage, even though by that time Lexington had had *eight years* to investigate and had been involved in evaluating the issues, observing the repairs, and making partial payments on the claim for almost a decade. Lexington hired Wiss Janney despite having previously hired a different engineering firm whose findings aligned with Kleinfelder's. Lexington used the Wiss Janney investigation as an excuse to delay payment for F5 and H6. Unlike prior engineering reports based in part on physical inspections, the Wiss Janney opinion upon which Lexington would ultimately rely was solely based on a document review—and the documents being reviewed were primarily documents that Lexington already had access to.

39. Lexington provided no information as to why the documents it previously received from Plaintiffs were insufficient to make a coverage determination with respect to F5 and H6. Furthermore, Lexington could have requested the information back in 2014-2015 when it first was notified of the claim by Plaintiffs or when Kleinfelder's reports were provided in 2016 and 2017. Finally, much of this information and documentation had been previously produced to Lexington.

40. For example, Wiss Janney asked Plaintiffs to locate and produce photographs that Plaintiffs had provided to Lexington years previously, but in higher resolution. Some of the documents Wiss Janey demanded could even have been

obtained through a public library. Some of the information was simply no longer available because Lexington delayed from 2015 to 2023 in requesting it. Furthermore, Lexington should have already had much of the information it sought because it sent its own agents, adjusters and representatives to the site around the time of Plaintiffs' initial claim and on multiple occasions thereafter in the course of Lexington's investigation.

41. In total, Lexington made over 100 further requests for information from Plaintiffs in a desperate effort to find some excuse not to pay and to delay.

42. Responding to these requests for information would prove to be a time-consuming and expensive endeavor that required Plaintiffs to retain Kleinfelder once again. In good faith, despite a delay of more than two years in being reimbursed for any costs attributable to repairs of units F5 and H6, Plaintiffs made substantial information available to Wiss Janney and directed Kleinfelder to gather and provide Lexington with years' worth of engineering, geological and technical information about the Center. Until Plaintiffs protested, Lexington expected Plaintiffs to bear this expense.

43. In late 2023, as Wiss Janney performed its analysis, Lexington asked The Commons LLC to update its analysis of the total projected cost of the claim. As time had passed, The Commons LLC updated information on the affected units as well as projected repair costs. The Commons LLC, again in good faith, complied with Lexington's request and provided an updated analysis of the total projected cost of its claim.

44. Through the first half of 2024, Lexington continued to withhold payment while refusing to provide any further coverage analysis or indication of what expenses it would reimburse with respect to the repairs of units F5 and H6. Lexington claimed it wanted to work toward a global resolution, including of all losses that Plaintiffs would continue to discover.

## LEXINGTON DENIES THE CLAIM A DECADE AFTER IT WAS MADE

45. Lexington's bad faith became manifest on July 1, 2024. On that day, nearly ten years after Plaintiffs originally notified Lexington of the claim, and despite Lexington having covered precisely the same type of damage to eight units over the past eight years, Lexington suddenly denied coverage for repairs to units F5 and H6 as well as Barnes & Noble, which Lexington had previously paid.[1] Lexington's denial of coverage for F5 and H6 is legally and factually baseless and simply an attempt to reverse course on coverage, which it now views as too expensive.

46. Lexington based its belated and pretextual bad-faith denial on a purported application of the "known loss" doctrine, falsely alleging that Plaintiffs knew about the claimed losses prior to 2014. This is untrue. Plaintiffs first identified the covered losses during the Policy's 2014-2015 coverage period and, in fact, had no knowledge of the gypsum issue until Kleinfelder conducted an extensive investigation and issued its 2017 Addendum. In fact, the original Kleinfelder report from May 2016 attributed all of the damage to a different cause, namely unloading of the bedrock combined with wet and expansive soils. That it took a top engineering firm multiple investigations to uncover the true and complete cause of the loss is a strong indicator of how difficult this issue was to identify. Moreover, for Lexington to assert this supposed basis for denial after a decade of paying on the claim and Caruso relying—to its own detriment—on Lexington's full support of the incremental repair process demonstrates the hallmarks of insurer bad faith.

47. In the shadow of Lexington's recent denial of coverage, Plaintiffs' losses continue to mount. Plaintiffs have recently observed damage of the same type that has previously been claimed at the unit formerly occupied by Lululemon at

---

[1] Lexington now says that there is no coverage for the damage at the Barnes & Noble space despite already having paid over $75,000 to repair the slab there.

the Center. These losses are almost certainly caused by the ongoing growth of gypsum under the Center. Plaintiffs have incurred damage at this unit, and in turn submitted costs to Lexington, of over $271,000. Although a substantial amount of gypsum has been located under the slab at that unit, establishing the same mechanism of damage Kleinfelder identified in 2017, Plaintiffs anticipate that, based on Lexington's denial of F5 and H6 under their new position, Lexington will deny coverage for this claim and refuse to pay the cost of repair and business interruption for this unit. Lexington will be liable for the same causes of action set forth below as to the Lululemon unit.

48. As a result of Lexington's delay, bad faith tactics, and improper denial of coverage, Plaintiffs were forced to file the instant lawsuit.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract – By Plaintiffs Against Defendant)

49. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

50. In 2014, Plaintiffs and Lexington entered into the Policy—a valid and binding written contract. The original term of the Policy was from July 15, 2014 to July 15, 2015. The Policy was renewed several times—in part based on the fact that Plaintiffs naively believed Lexington was acting properly and in good faith in connection with the at-issue claim—and Lexington continued to provide Plaintiffs property insurance coverage through July 14, 2024. Plaintiffs paid millions of dollars to Lexington between 2014 and 2024 for this continued coverage.

51. Under the terms of the Policy, Lexington agreed to cover physical loss or damage to the Center, subject to certain exclusions not applicable here.

52. Plaintiffs timely notified Lexington of slab damages at the Center and timely notified Lexington of damages to units F5 and H6 at the Center and provided Lexington with support for the losses resulting therefrom.

53. Defendant breached the Policy by delaying a coverage decision for

years and by ultimately refusing to provide coverage for the losses at F5 and H6, which are not excluded under the Policy.

54. Except for those terms and conditions which were waived or excused by Defendant's conduct or breach, Plaintiffs fully performed all conditions, covenants and promises under the Policy.

55. As a proximate result of Defendant's breach of the Policy, Plaintiffs were harmed and are owed the money from Defendant in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

**(Breach of the Implied Covenant of Good Faith and Fair Dealing – By Plaintiffs Against Defendant)**

56. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

57. Plaintiffs and Lexington entered into a valid and binding written contract (the Policy). Plaintiffs performed all, or substantially all, of their obligations under the Policy.

58. Implied in every contract is a covenant of good faith and fair dealing, which provides that neither party will do anything to deprive the other party of the benefits of the agreement. This covenant requires that each party to the agreement act with fairness and good faith towards the other.

59. Lexington tortiously breached its implied covenant of good faith and fair dealing by among other things (1) delaying more than three years in providing a coverage decision to Plaintiffs on F5 and H6 despite having covered other units at the Center with the same damage; (2) putting its interests ahead of Plaintiffs'; (3) taking inconsistent positions on coverage without sound factual or legal basis; (4) retaining a second engineering firm to re-investigate the claim—imposing a significant burden on Plaintiffs—after Lexington's prior engineering firm had already investigated the claim years earlier (and had apparently reached a

conclusion that caused Lexington to incrementally pay on the claim) and despite having had the opportunity to thoroughly investigate the damage at the Center since 2015; (5) refusing to properly respond to inquiries from and information provided by Plaintiffs, and refusing to properly communicate with Plaintiffs in a fair and timely manner; (6) making numerous duplicative and burdensome demands for documents; (7) using delays caused by Lexington's own conduct to draw out the claims process long enough to allow Lexington to formulate pretextual bases for denying Plaintiffs' claim; (8) inducing Plaintiffs to take a particular course of action (the incremental repair process) that, without Lexington's coverage, would prove significantly more costly to Plaintiffs; and (9) denying coverage under a false factual theory and plainly incorrect legal theory.

60. By doing so, Lexington acted in bad faith, violated the covenant of good faith and fair dealing, and violated Title 10, Section 2695.7(c)(1) of the California Code of Regulations.

61. Furthermore, Lexington acted intentionally and with malice, oppression and/or fraud, entitling Plaintiffs to an award of punitive damages. In addition, Plaintiffs are entitled to recovery of attorneys' fees and costs expended in order to obtain coverage.

62. As a direct result of Lexington's breach, Plaintiffs were harmed and are owed an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

**(Claim for Declaratory Relief – By Plaintiffs Against Defendant)**

63. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

64. An actual controversy has arisen and now exists between Plaintiffs and Lexington. Plaintiffs contend that the Policy affords coverage for the loss they claimed at the Center, including the loss at units F5 and H6. However, Lexington has denied coverage for the loss at F5 and H6 and appears to take the position that

1  Plaintiffs were not entitled to any coverage under the Policy because they allegedly
2  had knowledge of the loss before the Policy was in effect.
3      65.    Losses that relate back to Plaintiffs' initial claim under the Policy
4  continue to manifest at the Center.  Plaintiffs anticipate that Lexington will deny any
5  claims for these related losses.
6      66.    Accordingly, Plaintiffs request a declaration from this Court that
7  Plaintiffs are entitled to coverage under the Policy for all claims that Plaintiffs have
8  previously made under the Policy as well as all claims in the future for damage
9  caused by heaving of the bedrock and gypsum growth at the Center, including but
10 not limited to a declaration that (1) the known loss doctrine has no application and
11 that (2) no exclusion in the Policy applies to bar coverage.
12 / / /
13 / / /
14 / / /
15 / / /
16 / / /
17 / / /
18 / / /
19 / / /
20 / / /
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Lexington as follows:

1. General and compensatory damages, according to proof on each cause of action for which such damages are available;

2. Equitable relief;

3. Declaratory relief;

4. Attorneys' fees and costs;

5. Punitive and exemplary damages in an amount to be proved at trial;

6. Prejudgment and post-judgment interest; and

7. Such other and further relief as the Court may deem just and proper.

DATED: October 31, 2024          **ELLIS GEORGE LLP**
                                   Eric M. George
                                   Noah S. Helpern
                                   Todd M. Lander

                                 **BROWN NERI SMITH & KHAN, LLP**
                                   Ethan J. Brown
                                   Sara C. Colón


                                 By:  ___*/s/ Noah S. Helpern*___
                                       Noah S. Helpern
                                       Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues such triable.

DATED: October 31, 2024

**ELLIS GEORGE LLP**
Eric M. George
Noah S. Helpern
Todd M. Lander

**BROWN NERI SMITH & KHAN, LLP**
Ethan J. Brown
Sara C. Colón


By: _____*/s/ Noah S. Helpern*_____
Noah S. Helpern
Attorneys for Plaintiffs